# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-04-00697-CV

**Michael Dean Sims, Appellant**

**v.**

**Patricia Kaye Sims, Appellee**

## FROM THE DISTRICT COURT OF TOM GREEN COUNTY, 391ST JUDICIAL DISTRICT NO. D-04-0007-F, HONORABLE THOMAS J. GOSSETT, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellant Michael Dean Sims and appellee Patricia Kay Sims were married for more than eleven years when appellee filed for divorce. Following a bench trial, the trial court signed a divorce decree awarding appellee the cash in her possession, her remaining retirement benefits, and the house the couple bought during the marriage. She was made responsible for the remainder of the house note, on which they owed about $45,000, was ordered to pay appellant $6,950 "in equity of the real property," and was made responsible for debt she owed under a bankruptcy plan. Appellant was awarded his truck and cash and personal items in his possession, including any equipment that remained from his lawn care business. The trial court found that appellant had "been guilty of cruel treatment" toward appellee and "knowingly and voluntarily waived any interest in" appellee's retirement benefits. Appellant appeals, arguing that the trial court erred in finding that

he waived his interest in the retirement benefits and in awarding appellee all of her remaining retirement benefits. We affirm the trial court's divorce decree.

**Factual Background**

The parties were married in May 1992, and appellee filed for divorce in January 2004. Appellee worked at Verizon for twenty-seven years, beginning in September 1976 for $2.80 an hour, and was the primary wage-earner during the marriage. In 1996, appellant was convicted of driving while intoxicated, incarcerated, and placed on probation. In December 2001, his probation was revoked, and he was sent to prison. Appellee took an early-retirement package in November 2003, while appellant was still in prison; when she retired, she was earning $50,000 a year, and under the retirement package she received a $50,000 cash severance payment and a $275,000 lump sum payment that she put into a retirement account ("IRA"). Appellant was released from prison in January 2004.

Appellee testified that throughout the marriage, appellant worked sporadically at different jobs. She said that most of what appellant earned "just paid for his expenses" and the rest "he just spent." Appellee said that appellant suffered from chronic emphysema, diabetes, and a back injury, and she did not think appellant was capable of doing strenuous physical labor anymore, but she believed he was capable of work that did not require difficult physical labor, including lawn care. She testified that at the time appellant was sent to jail, he was doing lawn work, but was not working or earning very much. He spent a lot of time drinking and using methamphetamine, and she believed he had been using drugs since his release from prison.

2

Appellee testified that appellant had abused her physically and verbally during the marriage and that there were several days when she could not go to work because of bruises on her face. In 1996, she obtained a restraining order against him after he punched her in the face and hit her with a telephone receiver, but she said that he "would break my resistance down and I would feel sorry for him. So I would let him come back home, you know. And things would be good for two or three months, and then we'd be right back in the same situation again." She testified that in May and July 2001, appellant beat her and tied her up with a dog leash, telling her that he would kill her if she called the police. She said that in the May incident, he disconnected the telephone and kept her under his control for about five days; she was tied with the leash for about two days, and he tied the leash to his wrist when he slept so she could not escape.

Appellee testified that in September 2002, while appellant was in prison, she was forced to file for bankruptcy because she could not make the monthly payments on her credit cards, which had been used to charge equipment for appellant's lawn care business. She testified that the bankruptcy covered her auto loan and credit card debts incurred during the marriage and before appellant went to prison, including "things that were charged for the lawn care business" like "riding law mowers, . . . two or three different kinds of self-propelled mowers, a weed eater[], all kinds of lawn equipment." She filed for bankruptcy separately rather than jointly because "they wouldn't let me include him because he was in prison." The bankruptcy proceeding settled about $50,000 in debt, she was ordered to pay $40,600 total, and at the time of trial she still owed $25,000.

Appellee testified that when she retired, she took a $275,000 lump sum payment instead of an annuity that would only have paid her $1,000 a month. To get the lump sum, she had

3

to get appellant's signature "giving up his rights to the yearly annuity payments," so she offered to pay him $10,000 as part of their separation agreement. Appellee introduced into evidence a letter she sent to appellant in October 2003, in which she said she was trying to arrange her retirement to get a lump sum so that she could give appellant some cash for him to find a place to live when he was released. She said that if she could not get the lump sum, she would continue working and would not be able to give appellant any cash. For appellee to get the lump sum, appellant had to "sign a paper for Verizon saying you're aware I'm taking the lump sum instead of the monthly payments. I'd also want you to sign a paper first before I elect it that I'm giving you this money as final payment." Appellant responded in November 2003, writing, "I believe there are more involved [sic] than just the small amount you are trying to pay me. And if I have to I'll hire me a lawyer and I believe I'll have more coming to me than you are offering. . . . I'm willing to accept Twenty-Five Thousand Dollars ($25,000) to solve this situation. I feel this amount is equitable for all concerned." Appellee agreed, and in November 2003, while still incarcerated, appellant signed an affidavit stating:

> "In consideration for any and all interest I may have in my wife's pension plan that she is or may be entitled to with Verizon, I hereby accept the sum of Twenty Thousand Dollars ($20,000.00), payable as follows: the sum of Ten Thousand Dollars ($10,000.00) to be paid to me on or about January 3, 2004; the remaining Ten Thousand Dollars ($10,000.00) to be paid to me within fifteen (15) days of my wife[']s receipt of her pension funds from Verizon.

> "I do this with full knowledge that upon my acceptance of this money, I waive any and all interest I may have in any funds she may receive now or [in] the future as a result of her pension plan, retirement or any benefits she may be entitled to arising from her employment with Verizon.

Appellee deposited $22,000 into appellant's bank account and "paid an additional $3,000 in taxes and penalties."[1] She testified that he used the money to finance a truck, but "traded it in on another truck and got a cash balance back" when he fell behind on the payments. Appellee also testified that she had recently given appellant $440 to pay one month's truck payment and insurance. At the time of trial, appellee had $15,000 cash remaining from her $50,000 cash severance payment.[2] She had $245,000 remaining in her IRA, which started at $275,000, because stocks and bonds had fallen and she had taken some money out with penalties.

Finally, appellee introduced a letter sent to appellant at the parties' address by a woman who called appellant "sweetheart," said she was "thinking about who is this man that has won my fragile heart," and signed the letter, "Bye My Love & friend." Appellant denied that he had a romantic relationship with the woman, who he said he met while playing games online; he testified both that he gave her his address and that he did not know how she got the address.

Appellant denied drinking, using methamphetamine, or abusing appellee in any way. He testified that he did not know about the $50,000 severance pay until appellee testified about it at trial, and he learned about the $275,000 payment from his attorney about a month before trial. He denied that he still owned most of the property listed as in his possession on appellee's inventory,

---

[1] Although appellant's affidavit states that he would receive $20,000 in exchange for any interest in appellee's benefits, his earlier letter to appellee said he would agree to accept $25,000. According to appellee's testimony, it seems that appellant received $22,000 in cash, and appellee may have paid $3,000 in debts that appellant otherwise would have owed.

[2] The $15,000 cash was not disclosed on appellee's initial inventory statement, and at trial, when she asked her attorney about it, her attorney said, "I omitted it. I'm sorry."

including the lawn care equipment, saying "before I went to prison, I sold every bit of that stuff." At the time of trial, appellant owned a truck he bought for $1,500 and his personal possessions; of the $20,000 he received from appellee, he only had $1 left. Appellant said he did not have any money to pay his bills, had not found work, and was applying for disability.

He testified that he did not understand the affidavit he signed and thought it "was the agreement . . . for me to have enough money to get a trailer house and a vehicle." He did not know appellee wanted a divorce until after his release from prison and thought she "needed space" when he was first released, which is why she asked him to live elsewhere. However, in her October 2003 letter about her retirement funds, appellee did not explicitly say she wanted a divorce, but said, "I'm sorry this has been such a shock for you and so hard to accept," going on to say that although she had tried to stand by appellant, as the time for his release neared, "reality sank in and the bubble burst." She said that although appellant promised things would be different this time, she had "heard that so many times in the past" and was "not taking that chance again," and she believed she and appellant had to learn to be happy alone before they could "be happy with someone else." She wanted to give him money to find a place to live, but to do that, she had to get the lump sum.

At the conclusion of the trial, the trial court stated that it found that appellant had physically abused appellee during the marriage and that his "testimony has been less than credible. He testified that he did not know about the—the retirement and the plan she had. . . . [I]n her letter to [appellant], she clearly explains what she is planning, why she needs to do what she is doing." The court ruled, "My finding [is] that he has waived his right to any retirement benefits other than the twenty thousand that has been paid to him." The trial court granted the divorce on grounds of

6

insupportability, cruelty, and felony conviction and made a finding of fact that appellant was "guilty of cruel treatment toward" appellee and had "knowingly and voluntarily waived any interest in the retirement benefits."

**Discussion**

In a divorce proceeding, a trial court must divide the parties' estate in a manner that the court "deems just and right." Tex. Fam. Code Ann. § 7.001 (West 2006). The court is not required to divide the community estate equally, but the division must be equitable. *O'Carolan v. Hopper*, 71 S.W.3d 529, 532 (Tex. App.—Austin 2002, no pet.). The trial court has broad, but not unlimited discretion, and an unequal division must be grounded in a reasonable basis. *Id.* The trial court may consider factors such as the parties' ages, educations, earning capacities, business opportunities, medical and financial conditions, and separate estates, the nature of the community property, and any benefits that the spouse who did not cause the dissolution of the marriage would have enjoyed had the marriage continued. *Murff v. Murff*, 615 S.W.2d 696, 699 (Tex. 1981); *O'Carolan*, 71 S.W.3d at 532. We review a trial court's division of property for an abuse of discretion. *Murff*, 615 S.W.2d at 699; *O'Carolan*, 71 S.W.3d at 532. The sufficiency of the evidence is relevant in considering whether the trial court abused its discretion. *O'Carolan*, 71 S.W.3d at 532. To amount to an abuse of discretion, the property division must be manifestly unfair. *Mann v. Mann*, 607 S.W.2d 243, 245 (Tex. 1980); *O'Carolan*, 71 S.W.3d at 532.

Appellee argues that "there can be no doubt" that appellant's affidavit was an agreement under sections 4.105 and 7.006 of the family code. However, the affidavit is signed only

by appellant, not appellee, and thus is not a marital property agreement pursuant to section 4.104 of the family code. *See* Tex. Fam. Code Ann. §§ 4.101-.104 (West 2006) (spouses may transform community property into separate property; such agreements must be in writing and signed by both spouses). Further, appellant repudiated his agreement before the trial court entered its judgment, and therefore, the affidavit cannot be considered an agreement incident to divorce pursuant to section 7.006 of the family code. *See id.* § 7.006 (West 2006) (in a divorce proceeding, spouses may enter into written agreement concerning property division; agreement may be repudiated or revised before court renders judgment unless agreement is binding under other law). However, the court could have viewed the affidavit as evidence of an agreement between the parties as to the disposition of appellee's retirement benefits, an agreement appellee fulfilled when she gave appellant more than $20,000 cash. The court determined that appellee was more credible than appellant and could have decided that it would be inequitable to disregard the parties' agreement after appellee relied on the agreement in deciding to take early retirement and in giving appellant the cash payments.

Even if we disregard the trial court's finding of fact that appellant waived his interest in appellee's retirement benefits, when the overall property distribution is viewed as a whole, it is not manifestly unfair so as to amount to an abuse of discretion. *See O'Carolan*, 71 S.W.3d at 532.

Appellee was granted all of her remaining retirement benefits, not all of which were community property. "[A] spouse has a community property interest in that portion of retirement benefits that the other spouse *earned during their marriage*." *Burchfield v. Finch*, 968 S.W.2d 422, 423 (Tex. App.—Texarkana 1998, pet. denied) (emphasis added). In this case, appellee worked for Verizon from September 1976 until November 2003, and the parties were married in May 1992, after

8

appellee had worked at Verizon for almost sixteen years.[3] Appellee was also granted the real property and was ordered to write appellant a check for half of the equity the parties had acquired; appellant expressed no interest in keeping the house and making the mortgage payments, and appellee believed he would be unable to make the payments. Appellee was made responsible for the entire bankruptcy debt, which covered debts she testified were incurred during the marriage, at least in part for appellant's lawn equipment. Although appellant denied it, appellee testified that appellant abused drugs during the marriage and since his release. Appellee gave appellant more than $20,000 in cash, but at the time of trial, about eight months later, appellant had nothing left but a truck worth about $1,500. Appellee testified that appellant was physically abusive, twice restraining her with a dog leash and more than once beating her so badly that she skipped work so that no one would see the marks he left on her face. At the time of trial, appellant was about forty-eight years old and had some amount of college education.[4] Although appellant testified that, due to his health, he could not continue his lawn care business and it "will be pretty hard" for him to find work, appellee believed appellant was capable of restarting the lawn care business or finding other employment that was not physically taxing.

---

[3] Appellant asserts that all of appellee's retirement benefits should be considered community property because appellee listed them as such in her inventory, but any agreement to transform separate property into community property must be clear and unequivocal. *See* Tex. Fam. Code Ann. §§ 4.202, .203 (West 2006) (spouses may agree to convert separate property into community property, but agreement must be in writing and signed by both parties, identify property in question, and state that property is being converted to community property).

[4] There was no evidence of appellee's age, educational background, or earning capacity should she try to find work in her retirement.

**Conclusion**

Based on this record, the trial court did not abuse its discretion in determining that appellant knowingly agreed to waive his rights to appellee's retirement benefits in exchange for a cash payment and in using that agreement as a guide in distributing the parties' estate. Nor was the trial court's unequal division of the community estate manifestly unfair. *See Mann*, 607 S.W.2d at 245; *O'Carolan*, 71 S.W.3d at 532. Therefore, we overrule appellant's issues on appeal and affirm the trial court's decree of divorce.

_____

David Puryear, Justice

Before Chief Justice Law, Justices Patterson and Puryear

Affirmed

Filed:  August 4, 2006